## FELIPE GRETA *v.* THE STATE.

EVIDENCE.— A husband being prosecuted for an assault with intent to murder his wife, and the evidence of the wife tending to show that his anger was aroused by the presence with her of an unknown man two days before the alleged assault, the defense offered to prove that some twenty days previous she had been surprised in an act of criminal intimacy with the unknown man, and that defendant was apprised of that fact. *Held,* that under the peculiar facts of this case, the exclusion of the proffered testimony was error. But it was not error to exclude proof of her general reputation for lewdness.

APPEAL from the District Court of Bee. Tried below before the Hon. H. C. PLEASANTS.

This is a branch of the case of *Greta* v. *The State,* 9 Texas Ct. App. 429, where a full account of the facts is reported. That case was for the murder of Julian Andreda, the step-father of Pabla, the appellant's wife. The indictment in the present case charged the appellant with an assault upon Pabla, with intent to murder her. Both cases arose out of the same transaction, and it occurred in Live Oak county, but the venue in the present case was changed to the county of Bee. In the opinion now reported will be found the evidence involved in the rulings. The conviction was for aggravated assault, and a fine of $25, the punishment assessed.

*Lane & Payne,* for the appellant.

*H. Chilton,* Assistant Attorney General, for the State.

HURT, J. The appellant was charged with an assault with intent to murder his wife, Pabla Greta, and was found guilty of an aggravated assault; from which judgment of conviction he appeals to this court. The main witness for the prosecution was his wife, who testified in

substance, as follows: "I am the wife of defendant; on Friday, the 8th day of August, 1879, my husband was going to Lagarto to get some corn ground, and wanted me to go with him to my mother's; I did not want to go, as I had seen my mother a short time before, but he said yes, I must go. My mother and her husband arrived at our house and I went with them home, and soon after we got to my father's house, defendant came; while at supper my baby cried, and ma told my sister to take care of it, and a man I did not know took the baby. Felipe, defendant, asked me afterwards who that man was, and I told him I did not know; he was mad about it; when he started for Lagarto, he wanted me to swear before my God, that I would not stir away from there until he came back.

"Defendant and his brother came back on Sunday; Julian (witness' step-father) shook hands with them and told my mother to go and make coffee. They all came into the house; Julian sat on the bed, and Felipe, defendant, sat on a chair on one side, and his brother took a chair on the other side, in reach of that gun. Defendant asked me for the baby, and sat and petted it for awhile, then gave it back to me; then defendant and his brother looked at each other in a way I did not understand, and I got up and went and sat on the lounge. Then defendant and his brother changed chairs, and defendant said to my father, 'will you please give me my baby?' and he said, 'yes, it is your baby and you can take it where you like;' then defendant jumped up and caught hold of the baby (which I held in my arms) with one hand, and drew his six-shooter on me with the other. Then my father sprang and caught hold of the six-shooter, and Victoriano (defendant's brother) said, 'Oh no, don't you shoot sister.' When father caught the pistol, defendant shot him through the hand; when the defendant drew the pistol on me, I let the baby go; defendant, when he

shot father through the hand, then shot him through the breast; Victoriano seized the gun and shot him too; defendant called to his brother to kill them all; after the shooting defendant and his brother rode away; defendant carried the child away; the child was about nine months old.' "

Cross: "When the defendant drew his six-shooter on me, he could have shot me if he had so minded; I dropped my hold on the child when the pistol was drawn on me."

The witness refused to answer the following question:

"When the defendant drew his six-shooter on you, did you jump back?"

The conduct of defendant, viewed through the light of the evidence of his wife alone, is very strange indeed. A faint gleam of light is shed upon this transaction by that part of the evidence by which we are informed that defendant asked his wife who the man was that took the child; she answering that she did not know, and that the defendant was mad, etc.

To explain this apparently mysterious, wanton and malicious conduct of the defendant, he proposed to prove that, about twenty days before the date of the assault, the witness, his wife, was surprised in undue intimacy amounting to infidelity with the unknown man, and that this infidelity was communicated to defendant prior to the alleged assault. To this the State objected, and the court sustained the objection, to which ruling of the court the defendant excepted, and reserved the point by bill. We are of the opinion that these facts were of a very important character, and that the jury should have been informed of them in order to a proper understanding of the conduct and bearing of defendant.

The evidence of the witness, environed with these facts, may have reasonably and justly been viewed in quite a different light from that in which it was seen and held without them. We are therefore of the opinion that the

court below erred in sustaining the objection of the State to the introduction of this evidence. The defendant proposed to prove the unchastity of this witness, his wife, by evidence of general reputation. The court refused to permit this; and in this we think there was no error.

The question raised as to the action of the court in overruling the defendant's challenge for cause to certain jurors will not likely arise upon another trial, and will not, therefore, be passed upon.

For the errors above designated, the judgment is reversed and the cause remanded.

*Reversed and remanded.*